IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREEDOM MEDICAL SUPPLY, INC. et al., | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 12-1078 |
| STATE FARM FIRE AND CASUALTY COMPANY, et al., | |
| Defendant. | |

**OPINION**

**Slomsky, J.**                                                    **February 12, 2014**

**I.      INTRODUCTION**

Plaintiff Freedom Medical Supply, Inc. ("Freedom Medical") brings this class action on behalf of itself and other parties who submitted bills to State Farm Fire and Casualty Company and State Farm Mutual Automobile Insurance Company (collectively, "State Farm" or "Defendants") for reimbursement for two medical devices not listed on the Medicare Fee Schedule.  Plaintiff claims that members of the class should have been paid 80% of their usual and customary charge for these medical devices pursuant to the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa. Cons. Stat. §§ 1701 et seq. (hereafter "MVFRL").  Plaintiff argues that State Farm paid less than the required amount.

In order to vindicate its right to the 80% reimbursable amount, Freedom Medical filed this class action suit on February 3, 2012 in the Court of Common Pleas in Philadelphia, Pennsylvania.  (Doc. No. 1, Ex. A.)  On February 28, 2012, the case was removed to this Court.  (Doc. No. 1.)  The Complaint contains two counts in which reimbursement is sought.  Count I alleges a violation of 75 Pa. Con. Stat. §§ 1716 and 1797, and Count II alleges a claim for

negligence.  Under 75 Pa. Con. Stat. § 1716, benefits must be paid by insurers, such as State

Farm, within thirty days after the insurer receives reasonable proof of the amount of the benefits.

Under 75 Pa. Con. Stat. § 1797, the amount of reimbursement is subject to a statutory limit.

On May 15, 2013, both parties filed Motions for Summary Judgment.  (Doc. Nos. 53,

56.)  Both Motions have been fully briefed by the parties and are now ripe for disposition.[1]  For

reasons that follow, Defendants' Motion for Summary Judgment will be granted and Plaintiffs'

Motion will be denied.

## II.    BACKGROUND

Plaintiff Freedom Medical is a medical supplier that distributes medical equipment to

individuals injured in automobile accidents when the injury is covered by an automobile

insurance policy.  After Freedom Medical supplies the medical device to an injured person, it

then bills the patient's insurance company for reimbursement.  State Farm is an insurance

company that provides automobile insurance which includes coverage for the devices supplied

here.

At issue in this case are two devices that Freedom Medical supplies to injured insureds of

State Farm, a neuromuscular stimulator ("EMS") and a portable whirlpool ("Whirlpool").  The

EMS and Whirlpool are both considered Durable Medical Equipment ("DME") that Freedom

Medical is permitted to provide directly to insureds.

In Pennsylvania, the MVFRL, codified in 75 Pa. Con. Stat. §§ 1701 et seq., and the

accompanying regulations codified in 31 Pa. Code § 69.1 et seq., govern reimbursement for

---

[1] In deciding the parties' Motions for Summary Judgment, the Court has considered Defendants'
Motion for Summary Judgment (Doc. No. 53), Defendants' Statement of Undisputed Facts
Accompanying the Motion for Summary Judgment (Doc. No. 54), Plaintiffs' Response in
Opposition (Doc. No. 59), Defendants' Reply (Doc. No. 61), Plaintiffs' Motion for Summary
Judgment, the Memorandum in Support of the Motion and Exhibit 7 to the Motion for Summary
Judgment (Doc. Nos. 56, 60, 57), and, finally, Defendants' Response in Opposition (Doc. No.
58).

products and services for those injured in motor vehicle accidents.  Both Freedom Medical and

State Farm are required to comply with the MVFRL and accompanying regulations.

The MVFRL distinguishes between prices listed on the Medicare Fee Schedule for

treatments and products, and those that are not listed.  For those treatments and products not

listed on the Medicare Fee Schedule, Section 1797(a) states that the amount of the payment may

not exceed 80% of the provider's usual and customary charge.  75 Pa. Con. Stat. § 1797(a).

Neither the EMS nor the Whirlpool are included on the Medicare Fee Schedule and are therefore

unlisted products subject to the 80% limit.  (Doc. No. 54 at ¶ 2.)

Freedom Medical primarily purchases the equipment from wholesalers.  Freedom

Medical pays $20 to $26 for the EMS.  (Doc. No. 54 at ¶ 5.)  Between 2010 and 2011, Freedom

Medical charged patients $1,525 for the EMS, and sought to be paid 80% of this charge by State

Farm, or $1,200.  (Id. at ¶ 9.)  From 2012 to the present, Freedom Medical has charged $1,600

for the EMS, and seeks to be reimbursed $1,280 from State Farm.  (Id. at ¶ 12.)  Freedom

Medical pays $39.95 for the Whirlpool, and charges patients $525.  (Doc. No. 54 at ¶ 6.)

Freedom Medical seeks to be paid 80% of this charge by State Farm, or $420.

Prior to June 2010, State Farm reimbursed Freedom Medical at 80% of the amount it

charges patients for the EMS and Whirlpool.  In June 2010, however, Jamie Arnold, a State Farm

claim representative in Pennsylvania, undertook a review of the amounts that providers in

Pennsylvania billed for the EMS and Whirlpool.  (Doc. No. 54 at ¶ 17.)  In connection with his

review, Arnold conducted market research to determine an average price for both products.  (Id.

at ¶¶ 24-29.)

First, Arnold conducted an individualized inquiry for each device by researching the

make and model of the EMS and Whirlpool being dispensed.  In connection with this review, he

3

contacted DME providers located in the Philadelphia area to determine their prices for both products. He learned that the EMS models for which State Farm was being billed by providers were all of a like kind and quality, and were priced similarly. (Doc. No. 53 at 7.)

Next, Arnold purchased EMS and Whirlpools from providers in Berks, Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania, and Camden and Gloucester counties in New Jersey, to determine an average price for these devices. (Id.) For the EMS, Arnold based his average price on the purchase of five different models from ten different sellers, including internet sources, which ranged from $93.95 to $264.95. He then added a six percent Pennsylvania sales tax. Arnold concluded that the average price for the EMS is $151.10, with 80% of that charge being $120.88. For the Whirlpool, Arnold based his average price on the purchase of devices from eight different providers, with prices ranging from $54.79 to $106.65. Again, he added a six percent Pennsylvania sales tax.[2] Arnold determined that the average price for the Whirlpool is $97.19, with 80% of that charge being $77.75. (Id. at ¶¶ 30, 32-33, 36-37.)

Beginning in June 2010, State Farm began paying Freedom Medical $120.88 and $77.75 respectively as the reimbursable amount for the EMS and Whirlpool, which is 80% of the usual and customary charge for each device based on Arnold's research and calculations.[3] (Id. at 38.) As a result, on February 3, 2012, Freedom Medical commenced this class action against State Farm in the Court of Common Pleas in Philadelphia, Pennsylvania. On February 28, 2012, the

---

[2] Arnold did not use the New Jersey sales tax in his calculations. The New Jersey sales tax is seven percent.

[3] The Complaint notes the date as June 2010 when State Farm began paying the lower reimbursement amount, while State Farm's Motion for Summary Judgment refers to March 2011 as the appropriate date.

case was removed to this Court.  As noted above, the Complaint contains two counts.  Count I alleges a violation of 75 Pa. Con. Stat. §§ 1716 and 1797, and Count II alleges negligence.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat. Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49.

The movant "bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact." Mendoza v. Gribetz Intern., Inc., No. 10-1904, 2011 WL 2117610, at *2 (E.D. Pa. May 27, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  If the movant makes such a showing, "then the burden shifts to the non-movant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial." Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

In deciding a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the non-moving party. MacFarlan, 675 F.3d at 271; Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Anderson, 477 U.S. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D.Pa.2006). "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" Id. (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir.2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir.1998)).

## IV.     ANALYSIS

### A.     The MVFRL Provides Two Permissible but Non-Exclusive Methods for Calculating a Usual and Customary Charge

At issue in this case is the proper interpretation of the MVFRL and the accompanying regulations for calculating a "usual and customary charge" for EMS and Whirlpools. There are

three key sections relevant to resolving the issues presented for summary judgment: (1) 75 Pa. Con. Stat. § 1797; (2) 31 Pa. Code § 69.43; and (3) 31 Pa. Code. § 69.3.

Section 1797 of the MVFRL differentiates between treatments and products with a price established on the Medicare Fee Schedule, and those without an established price. For those without an established price, Section 1797 states:

> If a prevailing charge, fee scheduled, recommended fee, inflation index charge or DRG payment[4] has not been calculated under the Medicare program for a particular treatment, accommodation, product or service, the amount of the payment may not exceed 80% of the provider's usual and customary charge.

75 Pa. Con. Stat. § 1797. Thus, Section 1797 limits the amount that medical providers may charge for medical devices and services not listed on the Medicare Fee Schedule to 80% of their "usual and customary charge." Under this statute, a medical provider, such as Freedom Medical, may not charge an insurance company, such as State Farm, more than 80% of the usual and customary charge for the Whirlpool and EMS. This fact is not in dispute by the parties.

Given this statutory language, the parties disagree about the required method for calculating the usual and customary charges for the EMS and Whirlpool. Freedom Medical contends that State Farm must use one of the two methods delineated in 31 Pa. Code. § 69.43 in order to calculate the usual and customary charge for the EMS and Whirlpool. They are either "the requested payment amount on the provider's bill for services" or "the data collected by the carrier or intermediaries to the extent that the data is made available." State Farm, on the other hand, submits that while Section 69.43 delineates two permissible methods for calculating the usual and customary charge, other methods may also be used and points to Section 69.3 of the Pennsylvania Code in support of its position.

---

[4] DRG payment stands for diagnostic related groups payment, and is another method of calculation that Medicare may use when calculating a charge.

Section 69.43 of the Pennsylvania Code provides as follows:

> [I]n calculating the usual and customary charge, an insurer may utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available.

31 Pa. Code § 69.43.  "Usual and customary" is defined in Section 69.3 of the Pennsylvania Code as:

> [T]he charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.

31 Pa. Code. § 69.3.

In applying the language of a state statute, a federal court looks to interpretations of the statute by state courts.  When there are no reported decisions by a state court interpreting the statute at issue, a federal court then looks to principles of statutory construction under state law and makes a reasonable determination as to how the state's highest court would construe the statute.  Estate of Meriano v. C.I.R., 142 F.3d 651, 659 (3d Cir. 1998).  In addition, "[The Pennsylvania Code is "to be construed in the same fashion as statutes . . . ."  Bukics v. Bukics, 49 Pa. D. & C.3d 333, 337 (Pa. Ct. Common Pleas 1988).  Moreover, the Pennsylvania Supreme Court has held that "[t]he plain language of a statute is the foremost indication of legislative intent."  Trill v. Cores, 851 A.2d 903, 905 (Pa. 2004).

Here, to date, Pennsylvania state courts have not interpreted Sections 69.43 or 69.3 of the Pennsylvania Code.  Further, the MVFRL has not been interpreted with respect to the exact method for calculating a "usual and customary charge" for a device not listed on the Medicare Fee Schedule.  Thus, this Court must examine the plain language of the statute and principles of

statutory construction under Pennsylvania state law in order to make a reasonable interpretation of the language of the above noted sections as it applies to the facts here.

Section 69.43(c) of the Pennsylvania Code states that in calculating the usual and customary charge, an insurer "may" utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available.  The word "may" demonstrates that an action is permissive rather than mandatory.  Weiner v. Pritzker, 2001 WL 1807929 at *3 (Pa. Ct. C.P., Dec. 11, 2001); Commonwealth v. Barniak, 350 Pa. Super. Ct. 459, 464 (1986) ("While the word 'shall' might, in a proper setting, be interpreted as permissive, the word 'may' can never be given the imperative meaning.").

As set forth above, a provision of Section 69.43(c) provides that in calculating the usual and customary charge, an insurer "may" utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available.  31 Pa. Code § 69.43.  However, in other provisions of Section 69.43(c) of the Pennsylvania Code, the word "shall" is used.  Id.  ("An insurer shall pay the provider's usual and customary charge . . . An insurer shall pay 80% of the usual and customary charge for services rendered if no Medicare payment exists.").[5]

Using the above principles of statutory interpretation of Pennsylvania state courts as a guide, the word "may" must be given its ordinary meaning.  Further, the Pennsylvania Consolidated Statute provides that words and phrases "shall be construed according to rules of grammar and according to their common and approved usage . . . ."  1 Pa.C.S.A. § 1902(a).

---

[5] The Supreme Court of Pennsylvania has held that when the word "may" appears in one part of a statute and the word "shall" appears in another part, this "cannot be considered insignificant or coincidental."  Bethenergy Mines, Inc. v. W.C.A.B., 570 A.2d 84, 85-86 (Pa. 1990); Hotel Casey Co. v. Ross, 23 A.2d 737, 740 (Pa. 1942).

Section 69.43, therefore, provides two discretionary methods for calculating the "usual and customary charge" of a product, but those methods are merely illustrative and not mandatory or exclusive.  While Freedom Medical contends that State Farm must use one of the two methods referred to, a plain reading of Section 69.43 provides otherwise.  Since the word "may" is not synonymous with the word "shall," which would make the use of one of the two methods mandatory, under a plain reading of Section 69.43, State Farm is permitted to use one of the two methods noted, but it is not required to do so.  Rather, State Farm has the option to look to other provisions of the Pennsylvania Code for guidance on what is a "usual and customary charge," and is not restricted to the two means provided in Section 69.43.

**B.**      **State Farm's Method of Calculating a Usual and Customary Charge Complies with the MVFRL**

In light of the above interpretation of Section 69.43, the Court next must determine whether State Farm used an acceptable method for calculating a usual and customary charge for the EMS and Whirlpool.  To make this determination, the Court will examine the other relevant section of the Pennsylvania Code for guidance.

Section 69.3, cited above, provides clarity on the meaning of "usual and customary." Under Section 69.3, "usual and customary" is defined as "the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided."  31 Pa. Code § 69.3.  The Commonwealth Court of Pennsylvania has held that "usual and customary" may refer to a single provider seeking reimbursement, or to an aggregate or average of multiple providers' charges.  Hosp. Ass'n of Pennsylvania, Inc. v. Foster, 629 A.2d 1055, 1058 (Pa. Commw. Ct. 1993).

Here, in accordance with this precedent, in determining the "usual and customary charge" for the EMS and Whirlpool, Jamie Arnold, a representative of State Farm, reviewed the amount that similarly situated DME distributors and providers in the greater Philadelphia area charge for the two items.  To do so, Arnold consulted with sellers either located in the Philadelphia area or who used the internet to sell the Whirlpool and EMS.  Based on his research, Arnold found a price range for the EMS of $93.95 to $264.95.  Arnold used this information to calculate the average price for an EMS.  It was $151.20.  Thus, State Farm claims that this price is the "usual and customary price" for the EMS.  For the Whirlpool, Arnold found that the sale price ranged from $54.79 to $106.65.  Using this information, Arnold determined that an average price for the Whirlpool is $97.19.  State Farm claims that this price is the "usual and customary price" for the Whirlpool.

Arnold's research relied on a group of providers of similar training, experience, and licensure in accordance with Section 69.3.  The providers were from Berks, Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania, and Camden and Gloucester counties in New Jersey, and are located in the geographic area where the EMS and Whirlpool are sold by Freedom Medical.  They were similarly situated DME providers.  (Doc. No. 53 at 2.)

Freedom Medical contends that there are two problems with the research that State Farm based its calculations on.  First, it contends that the providers that Arnold ultimately used are not providers of similar training, experience, and licensure to Freedom Medical, because many do not submit bills to State Farm under the MVFRL.  Second, Freedom Medical claims that State Farm should not have included two EMS models and one Whirlpool model from a company known as VSP Medical Supply ("VSP").

11

These arguments are unpersuasive.  The MVFRL is silent regarding the meaning of providers of similar training, experience, or licensure and does not state that the providers must all submit bills to insurance companies for reimbursement.  In fact, State Farm intentionally avoided using those types of providers because it "suspected and confirmed that many providers submitting bills were charging excessively high prices for these products."  (Doc. No. 58 at 7.) These suspicions were confirmed during discovery in this case, which revealed that many other Philadelphia area DME providers had similar high markups for the EMS and Whirlpool as Freedom Medical.  (Id.)  Therefore, for State Farm to conduct unbiased research of average prices not subject to inflation, it was necessary to examine providers not involved in the insurance reimbursement process.

Next, Freedom Medical contends that VSP Medical Supply should not have been included in State Farm's research because VSP only made three sales of the Whirlpool and EMS, two of which were to Arnold as part of his research.  (Doc. No. at 11.)  Again, the MVFRL and related regulations do not state which providers should or should not be included in calculating a usual and customary charge.  Arnold used other providers in his research in addition to VSP, and including VSP was not in error.

### 1.    The MVFRL Requires that Freedom Medical's Charge for the EMS and Whirlpool Devices be Reasonable

The purpose and spirit of the MVFRL require that the usual and customary charge for necessary medical products and treatments be reasonable.  Under the MVFRL, automobile insurance companies such as State Farm must provide insurance coverage "for reasonable and necessary medical treatment and rehabilitative services."  75 Pa. Con. Stat. § 1712(1).  The intent of the General Assembly in enacting the MVFRL was to reduce the rising cost of purchasing motor vehicle insurance and to provide a minimal level of compensation for victims of motor

12

vehicle accidents.  <u>Pittsburgh Neurosurgery Assocs., Inc. v. Danner</u>, 733 A.2d 1279, 1282 (Pa.

Super. Ct. 1999); <u>Cangemi v. Com., Dept. of Transp., Bureau of Driver Licensing</u>, 8 A.3d 393,

400 (Pa. Commw. Ct. 2010).  The Pennsylvania Superior Court has referred to the overall policy

of the MVFRL as "cost containment."  <u>Adamitis v. Erie Ins. Exchange</u>, 54 A.3d 371, 377 (Pa.

Super. 2012).

      In 1990, Section 1797 of the MVFRL was enacted "to establish a specific procedure for

evaluating the reasonableness of charges for medical care."  <u>Levine v. Travelers Property Cas.</u>

<u>Ins. Co.</u>, 69 A.3d 671, 676 (Pa. Super. Ct. 2013).  The MVFRL has been interpreted in

accordance with this purpose.  For example, in <u>Allied Medical Assocs. v. State Farm Mut. Auto.</u>

<u>Ins. Co.</u>, the court examined various charges for medical procedures under the MVFRL.  No. 08-

2434, 2009 WL 1578603 (E.D. Pa. June 3, 2009).  The court held that pursuant to the MVFRL,

"an insurer need only pay providers for medical procedures that are reasonable and necessary,"

and "are not responsible for procedures that are unnecessary or unreasonable." <u>Id.</u> at *7.  While

medical devices rather than medical procedures are at issue in this case, the same principle of

reasonableness applies to the charge for EMS and Whirlpool devices.

      Consistent with the legislative intent of the MVFRL, Section 69.21 of the Pennsylvania

Code provides that "[t]he provider may not require payment in excess of the Medicare payment

pertaining to the applicable specialty under Medicare for comparable services at the time

services were rendered, or the provider's usual and customary charge, whichever is less."  31 Pa.

Code § 69.21.  While neither the EMS nor the Whirlpool are listed on the Medicare Fee

Schedule, the underlying policy of this section is that the lower price between the two options

should be used, which furthers the aim of reducing costs.  Thus, since it is evident that cost

containment is a vital policy of the MVFRL, the reimbursable amount sought by Freedom

Medical from State Farm runs counter to this policy by being unusually excessive.

2.      **Freedom Medical's Markups for the EMS and Whirlpool Are Unreasonable**

Based on the data compiled by State Farm, the cost for the EMS ranged from $93.95 to

$264.95.  Freedom Medical, however, bills insureds $1,600 for the EMS, and seeks

reimbursement from State Farm of $1,280, which is 80% of the billed amount.  Even considering

the highest possible cost for the EMS, which is $264.95, a charge of $1,280 is not reasonable.

The same is true for the Whirlpool.  The cost for the Whirlpool is between $54.79 and

$106.65.  Freedom Medical, however, bills insureds $525, and charges State Farm $420, which is

80% of the billed amount.  Even considering the highest amount paid for the Whirlpool, which is

$106.65, a charge of $420 is not reasonable.

Moreover, there is another critical reason why the amount charged to insureds and the

amount sought as reimbursement by Freedom Medical is not reasonable.  State Farm insureds

typically have a $5,000 limit on their medical coverage.  (Doc. No. 58 at 11.)  A charge of $575

for the Whirlpool and/or $1,280 for the EMS exhausts a significant portion of an insured's

$5,000 coverage.  Because the overall aim of the MVFRL is to "afford the greatest amount of

coverage to the injured claimant . . . [and to] reduc[e] the rising costs of insurance," the large

inroad to the coverage amount that Freedom Medical seeks as reimbursement is further evidence

of the unreasonableness of the disproportionate charges.

3.      **The MVFRL Does Not Require an Insurer to Consider Data from the NHIC Corp. or the Workers' Compensation Fee Schedule**

Freedom Medical contends that if State Farm does not wish to use the requested payment

amount that it bills for the EMS or Whirlpool, then it must use the second method of calculation

14

set forth in Section 69.43, which is data collected by the carrier or intermediaries.  According to

Freedom Medical, "carrier" must refer to NHIC Corp., the Durable Medical Equipment

Medicare Administrative Contractor (DME MAC) for Jurisdiction A which services

Pennsylvania.  Freedom Medical further submits that "intermediary" must refer to an

organization with a contractual relationship with the Health Care Financing Administration to

process Medicare Part A claims. (Doc. No. 56 at 7.)  State Farm disagrees with these definitions

of "carrier" and "intermediary," and also submits that it is not required to use this data to

calculate a usual and customary charge.

As noted previously, State Farm is not required to use one of the two methods for

calculating "usual and customary" provided by Section 69.43.  Therefore, the Court need not

address the meaning of "data collected by carrier or intermediaries" in that Section.

In addition, Freedom Medical contends that State Farm must consider the Whirlpool and

EMS prices listed on the Workers' Compensation Fee Schedule.  Nothing in the MVFRL or

accompanying regulations, however, requires that insurers must consider the Workers'

Compensation Fee Schedule, or links the Workers' Compensation statute to the MVFRL.  The

purpose of the Workers' Compensation statute is to provide injured employees relief for

workplace injuries.  O'Brien v. Workers' Comp. Appeal Bd., 780 A.2d 829 (Pa. Commw. Ct.

2001; Workman's Comp. Appeal Bd. v. Overmyer Mold Co., 374 A.2d 689, 691 (Pa. 1977).  The

purpose of the MVFRL is to provide a minimal level of compensation for victims of motor

vehicle accidents and to reduce insurance costs.  Nothing in either statute mandates that insurers

must use the Worker's Compensation Fee Schedule when calculating a usual and customary cost

for medical devices.

**B.      Freedom Medical's Negligence Claim Fails**

Count II of the Complaint alleges negligence based on State Farm's failure to properly calculate the reimbursement due to Plaintiff and the class pursuant to the MVFRL.  (Doc. No. 1-2 at ¶¶ 115-16.)  Because the Court finds that State Farm properly calculated 80% of a usual and customary charge for the EMS and Whirlpool, State Farm was not negligent.  Thus, the Court finds that Freedom Medical fails to establish a negligence claim against State Farm.

**V.      CONCLUSION**

Based upon a review of the cross-motions for summary judgment and related documents, the Court is satisfied that no genuine issue of material fact exists in this case, and Defendants are entitled to summary judgment in their favor.  The Court, therefore, will grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.  An appropriate Order follows.